CHARLES H. HIRSCHMAN

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa November 10, 1881—Rehearing denied March Term, 1882.*

1.. CRIMINAL LAW—EVIDENCE—*on indictment for manslaughter—as tending to explain conduct of accused.* On a trial of one for manslaughter, in shooting his father, who was shown to have been of a quarrelsome disposition when under the influence of liquor, and ill-tempered, and abusive towards his wife, the defendant's counsel offered to prove by a witness that the defendant in going to and from his work had to pass by the house of the witness, and that she knew of her own knowledge that it had been the uniform habit of the defendant, at all times when he knew that there was at the time

difficulty between his mother and the deceased, to refrain from going home, so as to keep out of the same, at such times expressing a desire to avoid being present, and that the difficulties between the deceased and his wife were of frequent occurrence about the time of the killing:  *Held,* that all of such evidence was properly excluded, as not tending to enlighten the issue.

2.  SAME—*as to previous conduct of the deceased.*  On such trial, it appeared that, at the time of the killing, the father was intoxicated and angry, and just preceding the act of shooting he had been engaged in a quarrel with his wife—the defendant's mother—but it was  *held,* evidence of the previous conduct of the deceased towards his wife was not admissible as tending to show whether the shooting was accidental, or in self-defence, or was willfully and maliciously done.

3.  SAME—*as to previous good character of accused—evidence in respect thereto—and its effect.*  On the trial of one for manslaughter, the defendant is allowed to give evidence only of his previous  *general* character in regard to peace and quiet, etc., and not proof of particular transactions in which he may have been previously concerned.  The witness can not be called upon for his personal knowledge of the prisoner's acts and conduct.

4.  On a charge of crime the previous good character of the accused is but a circumstance to be considered by the jury, in connection with all the other evidence, in determining the question of guilt or innocence.  If the evidence of guilt is complete and convincing, when considered with the evidence of previous good character, the evidence of good character will not avail.

5.  INSTRUCTION—*as to good character—construed.*  On the trial of one for manslaughter, an instruction that the defendant's evidence of his general reputation for peaceableness was allowable, and should be considered by the jury as a circumstance in the case; but that if, from all the evidence in the case, the jury were satisfied, beyond a reasonable doubt, of the guilt of the accused, it was their duty to find him guilty, notwithstanding the fact he had before borne a very good character for peaceableness, was  *held* not erroneous, as in effect directing the jury to disregard the proof of good character.

6.  SAME—*as to credibility of impeached witness.*  An instruction that the testimony of a defendant in a criminal case is to be tested by the same rules applicable to other witnesses in determining his credibility and the weight of his evidence, and that if the jury, after considering all the evidence in the case, find the accused has willfully and corruptly testified falsely to any fact material to the issue, they have the right to entirely disregard his testimony, excepting in so far as it is corroborated by "other credible evidence," is not erroneous.  The "other credible evidence," in such connection, includes all kinds and every kind of evidence.

7.  WITNESS—*credibility of defendant in criminal case.*  The jury in a criminal case are not bound to believe the testimony of the defendant, any further than it may be corroborated by other credible evidence, and there is no impropriety in so instructing them.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. KIRK HAWES, Judge, presiding.

Messrs. J. N. & W. F. BARKER, and Mr. ROBERT HERVEY, for the plaintiff in error:

The court erred in excluding the testimony as to the universal habit of the boy in keeping away from home at all times when he knew there was a difficulty between his mother and his step-father. Wharton on Criminal Law, sec. 1327.

As a defence, character for truthfulness may be set up, and Lord DENMAN once permitted the following questions: "What is the character for veracity and honor?" and, "Do you consider him a man likely to commit perjury?" See Wharton on Crim. Ev. 60.

"And the character he is entitled to prove must be such as would make it unlikely that he would be guilty of the particular crime with which he is charged." 1 Wharton on Crim. Law, sec. 646. See, also, 2 Russell on Crimes, 784, 785, and cases cited; 1 Greenleaf on Evidence, 54.

"It is conceded on all sides that evidence of character, when offered by the defence in criminal cases, is always relevant. Technically, therefore, it is always material." Wharton on Crim. Ev. 66. See, also, *Remsen* v. *People*, 57 Barb. 324; *Epps* v. *State*, 19 Ga. 102; *Harrington* v. *State*, 19 Ohio, 264.

Hence it is error in a judge to tell the jury, that "in a plain case a good character would not help the prisoner, but in a doubtful case he had a right to have it cast into the scales and weighed in his behalf," (*State* v. *Henry*, 5 Jones, (N. C.) 65,) the true rule being that in all cases a good character is to be considered of weight. *United States* v. *Whitaker*, 6 McLean, 342; *Cancemi* v. *The People*, 16 N. Y. 505; *Stover* v. *The People*, 56 id. 319; *People* v. *Ashe*, 44 Cal. 288; *People* v. *Bell*, 49 id. 486; *People* v. *Shepard*, id. 629.

The court erred in the third instruction, which assumes that the defendant is contradicted, and calls attention to isolated facts, and is erroneous in form and substance, as settled by decisions of this court. It gives undue prominence to an isolated fact, viz: the testimony of the accused, and is defective in its closing sentence, as held by this court in *Angelo* v. *Faul,* 85 Ill. 106.

An instruction as to what the presumption of law is upon a disputed fact, is extremely likely to mislead the jury, and should not be given. *Guardian Mutual Life Ins. Co.* v. *Hogan,* 80 Ill. 35; *Garretson* v. *Pegg,* 64 id. 111; *Cornwell* v. *Cornwell,* 91 id. 414.

When the court assumes to direct the attention of the jury to the facts, it should refer them to all the facts, so as to present the case fairly for both parties. *Evans* v. *George,* 80 Ill. 51; *Ogden* v. *Kirby,* 79 id. 556; *Elston Gravel Road Co.* v. *The People,* 96 id. 584.

Mr. JAMES McCARTNEY, Attorney General, for the People:

The instruction complained of does not in fact exclude from the consideration of the jury evidence of the defendant's character. It but tells the jury, that if, "from *all* the evidence in the case, they are satisfied," etc., how to find. There is nothing objectionable in this.

There is no error in the instruction to disregard the testimony of an impeached witness, except so far as it is corroborated by other credible evidence. See *Angelo* v. *Faul,* 85 Ill. 106; *Huddle* v. *Martin,* 54 id. 258; *Crabtree* v. *Hagenbaugh,* 25 id. 233; *Yundt* v. *Hartrunft,* 41 id. 9; *Miller et al.* v. *People,* 39 id. 457.

Mr. LUTHER LAFLIN MILLS, State's Attorney for Cook county, and Mr. HENRY W. THOMPSON, assistant State's Attorney, also for the People.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

Michael Boylan was shot and instantly killed by means of a pistol in the hands of his step-son, Charles H. Hirschman, on the evening of August 28, 1880, at Hyde Park, in Cook county. Because of this killing, Hirschman was subsequently convicted, by the circuit court of Cook county, of the crime of manslaughter, and sentenced to the penitentiary for the term of three years, and this writ of error is prosecuted for the purpose of having us review the record of that conviction. The main defence interposed upon the trial was, that the shooting was accidental, although it was also contended that the defendant, under the circumstances, would have been justified in taking the life of the deceased as in his necessary self-defence.

The defendant and a sister, as also several half sisters, children of the deceased, were residing in the family of the deceased, with their mother. The deceased was a teamster, employed, through the day, away from the house, and on the evening in which he was killed he returned home late— near nine o'clock—and, the evidence shows, in an intoxicated condition. When intoxicated he was ill-tempered, and frequently abusive and violent towards his wife and other members of his family. On this occasion, it appears, in consequence of not receiving a satisfactory answer as to the quality of the supper that awaited him, he became abusive towards his wife, and the defendant and his sister. However, he ate his supper, and then examined the feed of his horses, and cut some green grass for them. Preliminary to this, and in order to sharpen his scythe for cutting the grass, he procured a whetstone. After cutting the grass, he went to the well, which was near the porch, and commenced pumping water for his horses. Quitting this, he advanced towards the house, and was in the act of ascending the steps leading up to the porch, when he received the fatal shot from the pistol

in the defendant's hands. It is claimed the defendant had been up-stairs playing cards with a young friend, and knew nothing of the conduct of the deceased until he came down stairs to see his friend depart; that immediately after his friend had departed he went upon the back porch; that the deceased, who was then pumping the water, on seeing him there quit his pumping, and with the stone with which he had whetted his scythe in his hand, advanced rapidly up the steps towards the defendant, uttering an abusive epithet, and aimed a blow at him with the stone, when the defendant, in endeavoring to retreat, fell, and the pistol was accidentally discharged. It is claimed the defendant had had the pistol for some time, and on this evening had been oiling it, and temporarily put it in his pocket to await the departure of his friend before putting it away, and thus it was in his pocket when the deceased rushed upon him.

Upon the trial, one Mrs. Moots testified that she had known the defendant for ten years,—that he was a very good boy—"no fighting, no quarreling," adding: "People can't tell that Charlie is bad. All the neighbors say that Charlie is good." And thereupon the counsel for the defendant addressed the court as follows: "We offer to prove by this witness that the defendant, in going to and from his work, had to pass by her house, and that she knew of her own knowledge that it had been the uniform habit of defendant, at all times when he knew that there was at the time difficulty between his mother and the deceased, to refrain from going home, so as to be able to keep out of the difficulties, the defendant at such times expressing the desire to avoid being present at the time of such difficulties." And the counsel also proposed to prove by the witness that she knew that difficulties between deceased and his wife were of frequent occurrence at the time of defendant passing her house, etc., but the court refused to admit all and every part of such evidence to be given, and defendant excepted. The errors

assigned question this ruling, and counsel, in argument, insist it was erroneous.

It will have been observed that the witness was permitted to give evidence of the *general* character of the defendant in regard to peace and quiet, etc., and this is as far as the authorities go. Roscoe's Crim. Evidence, (5th Am. ed.) 97; 1 Greenleaf on Evidence, sec. 55. Says Wharton, in his work on Crim. Law, vol. 1, latter part of sec. 636, (7th ed.): "The proper question is, not 'personal knowledge' by the witness, but the defendant's 'general reputation.'" The quotation of this author in sec. 646, from Mettermaier, which counsel have copied into their brief, as shown in the latter part of the section, is not the law here. In 2 Russell on Crimes, 784, (7th Am. ed.) the author, after explaining that in all criminal prosecutions the prisoner is always permitted to call witnesses to speak of his general character, etc., adds: "The inquiry must also be made with reference to the general character of the prisoner, for it is general character alone which can afford any test of general conduct, or raise a presumption that the person who had maintained a fair reputation down to a certain period, would not then begin to act an unworthy part, and, therefore, proof of particular transactions, in which the prisoner may have been concerned, are not admissible." See, also, *McCarty* v. *The People*, 51 Ill. 231; *Hopps* v. *The People*, 31 id. 385; Wharton's Criminal Evidence, (8th ed.) sec. 60; *Cathcart* v. *Cowen*, 37 Pa. St. 108.

We are unable to perceive any theory upon which the conduct of the deceased towards his wife would, in consonance with established legal principles, tend to elucidate whether the defendant's pistol was discharged by accident, or whether he discharged it in his necessary self-defence, or willfully and maliciously. And however reluctant the defendant may, in general, have been to be present at the quarrels between the deceased and his mother, there is no question that a pistol in

his hands was discharged, and resulted in the death of the deceased. It is certain he was then near the deceased. We think the evidence was properly excluded as not tending to enlighten the issue.

The second instruction given by the court, at the instance of the People, is as follows:

"The court instructs the jury, as a matter of law, that the defendant has put in evidence his general reputation for peaceableness; that such evidence is permissible under the law, and is to be by the jury considered as a circumstance in this case. But the court further instructs the jury, that if, from all the evidence in this case, they are satisfied beyond a reasonable doubt of the guilt of the accused, then it is the duty of the jury to find him guilty, notwithstanding the fact that heretofore the accused has borne a very good character for peaceableness."

Counsel for defendant insist this is erroneous, because they say it in effect tells the jury to disregard the proof of good character. We do not think this is a reasonable construction of the language employed in the instruction. The jury are therein expressly told that they are to consider the proof of good character as a circumstance in the case. Instead of being told to disregard it, they are told directly the reverse. Good character is but a circumstance to be considered in connection with all the evidence, in determining the question of guilt or innocence. But if the evidence of guilt be complete and convincing, (which implies a consideration of the evidence of previous good character, as well as all other evidence,) then it is well settled law the evidence of previous good character can not, and ought not, to avail. And this is as far as the instruction goes.

The court also, at the instance of the People, in their third instruction, said to the jury:

"The court instructs the jury, as a matter of law, in this State the accused is permitted to testify in his own behalf; that when he does so testify he at once becomes the same as any other witness, and his credibility is to be tested by and subjected to the same tests as are legally applied to any other witness, and in determining the degree of credibility that shall be accorded to his testimony, the jury have a right to take into consideration the fact that he is interested in the result of this prosecution, as well as his demeanor and conduct upon the witness stand, and during the trial; and the jury are to take into consideration the fact, if such is the fact, that he has been contradicted by other witnesses. And the court further instructs the jury, that if, after considering all the evidence in this case, they find that the accused has willfully and corruptly testified falsely to any fact material to the issue in this cause, they have the right to entirely disregard his testimony, excepting in so far as his testimony is corroborated by other credible evidence."

Counsel for defendant object that this assumes that the defendant is contradicted,—that it gives undue prominence to an isolated fact, viz: the testimony of the accused, and also that it is defective in its closing sentence, as held by this court in *Angelo* v. *Faul*, 85 Ill. 106. The objection to the instruction in *Angelo* v. *Faul* was, that it omitted to include the words "on or by circumstances in evidence." But here the jury are told they are at liberty to disregard the evidence of the defendant, except "in so far as his testimony is corroborated by other credible evidence,"—that is, all kinds, or any kind, of evidence that may be before the jury, and not limited, as in *Angelo* v. *Faul*. We do not think it can be fairly said that this instruction assumes that the defendant is contradicted, for that is expressly left a question to be determined by the jury. The jury were not bound to believe the evidence of the defendant any further than it may have been corrobo-

rated by other credible evidence, (*Gainey* v. *The People*, 97 Ill. 270,) and we perceive no impropriety in saying so to them. The instruction, in substance, is sustained by *Crabtree* v. *Hagenbaugh*, 25 Ill. 233, *Yundt* v. *Hartrunft*, 41 id. 9, *Miller* v. *People*, 39 id. 457.

Finally, it is contended as a reason why the judgment below should be reversed, it is not sustained by the evidence. We are not convinced that the court below erred in this regard. There are many and very great improbabilities in defendant's story that the shooting was accidental. His account of why, in the first instance, he procured a pistol, is not satisfactory, and still less so is his version of why he took it with him down stairs at the time he admits he did. Its proper place, by his own showing, was in his room up stairs. It approaches the marvelous, to say the least, that the deceased could have accidentally come to his death in the manner claimed. But the defendant himself, according to the testimony of Joseph Snyder, on the day after Boylan was killed, admitted that he shot and killed Boylan. He says: "I am captain of Hyde Park police. I saw Charles Hirschman, August 29, 1880, in the station; had a conversation with him. I went into his cell to see if I knew the boy. I saw that I did not know him,—never saw him in the police station before. I said to him, 'This is a pretty sad affair.' He said, 'Yes, sir; have you heard from mother this morning?' I said, 'No, I had not been down.' I says to him, 'Boylan is dead.' He said, 'Yes, he is dead.' Says I, 'How far were you from him when you shot him?' He said, 'About eight feet.' Says I, 'Where do you think you hit him?' He says, 'Near the center of the breast, I think.' Then I asked him, did Boylan strike him. He said, no. Did he strike your mother? He said, no. He said Boylan was having some words with his mother, and he walked down stairs and shot him." *      *      *

We can not say this evidence should be disbelieved. The jury saw and heard the witness, and all that the able and eloquent counsel could urge to discredit him, and evidently still believed him. This evidence repels the theory that the shooting was in self-defence, as well as that it was accidental. We can have but little doubt that the defendant had witnessed the repeated brutal outrages, by speech and by blow, of the deceased upon his mother, and endured his reproaches and insult to himself until he became almost crazed with passion, and that then, under its influence, he fired the fatal shot; and this was, as the jury have found, not justifiable or excusable homicide, but manslaughter, if not, technically, a more serious crime.

The judgment is affirmed. *Judgment affirmed.*